LEE RATZEL,

        Plaintiff,

v.                                                                                                             Case No. 05-C-1236

JOE SIDEL,[1]

        Defendants.

## ORDER GRANTING SUMMARY JUDGMENT

Plaintiff Lee Ratzel, a Chapter 980 detainee at Wisconsin Resource Center ("WRC"), sued defendant Joe Seidl, a psychiatric care technician at WRC, under 42 U.S.C. § 1983 and Wis. Stat. § 51.61(1)(m) and (x). Ratzel claims Due Process and Equal Protection violations, as well as state law violations, in connection with Seidl's alleged use of excessive force. Now before the court is defendant's motion for summary judgment, which will be granted for the following reasons.

### BACKGROUND

Defendant Joe Seidl is employed by the Wisconsin Department of Corrections as a Psychiatric Care Technician ("PCT") at WRC. WRC houses, *inter alia*, sexually violent persons who are detained or committed under Wis. Stat. ch. 980. At the time of the incident in dispute, approximately 28 patients were housed in Unit H 18 of WRC; all patients therein were either committed or detained as sexually violent persons ("SVP") under Wis. Stat. ch. 980, and had

---

[1] The case name was generated from plaintiff's original complaint, which misspelled defendant Seidl's surname.

refused to participate in the SVP treatment program. (DPFOF ¶ 19.) Plaintiff Lee Ratzel is civilly committed to the care and custody of the State of Wisconsin pursuant to Wis. Stat. ch. 980 as a sexually violent person, and currently resides at WRC. At the time of the incident, he resided in Unit H 18. Ratzel alleges that on October 16, 2005, Seidl used excessive force on him when Seidl was attempting to direct Ratzel into his cell during a medication pass.

WRC has specific procedures, rules, and policies governing medication passes. (*E.g., id.* ¶¶ 6-13.) For example, at least two PCTs must be on the housing unit during a medication pass. (*Id.* ¶ 7.) Furthermore, residents who are to receive medications must line up and receive their medications one at a time from the nurse, while all patients not receiving medications are to remain in their rooms with the door closed. (*Id.* ¶¶ 8-9.) All staff members assigned to the housing unit are responsible to ensure order during the medication pass, which responsibility includes ensuring that no resident pass behind the medication cart at any time. (*Id.* ¶¶ 9-11.) The orderly distribution of medications prevents residents from confiscating items on the medication cart (e.g., syringes, stethoscopes, or measuring scales), lessens the possibility of medication errors, and allows medications to be distributed with as much respect for individual patients' confidentiality as possible. (*Id.* ¶ 12-13.) Although WRC has specific procedures governing medication passes, it has no specific rules, policies, or procedures outlining step-by-step what staff should do to ensure patient compliance during medication passes. (*Id.* ¶ 61.) Rather, PCTs and other staff must use their professional judgment and discretion in getting patients to comply with the medication pass rules and procedures. (*Id.*)

On October 16, 2005, Seidl was working in Unit H 18, where plaintiff resided. In anticipation of the medication pass scheduled for 8:30 p.m., Seidl announced to all patients that they

should go into their rooms and shut their doors unless they were expecting to receive medication. (*Id.* ¶ 20.) Seidl walked towards Ratzel's room after seeing that Ratzel's door remained open. (*Id.* ¶ 26.) On his way to Ratzel's door, Seidl continued to announce that all patient doors must be closed during the medication pass, and he also signaled by hand that all doors were to be shut. (*Id.* ¶ 28.)

The heart of Ratzel's complaint centers on several seconds that transpired after Seidl reached Ratzel's door. According to Ratzel, Seidl pulled Ratzel's door wide open, yelled to him to close the door during medication pass, and shoved Ratzel in the chest "with all his might," which caused Ratzel to stumble backward six feet and lose his breath for six seconds. (Compl. ¶¶ 12-20; Ratzel Aff. ¶¶ 14-22.) Ratzel also alleges that after Seidl walked away from the door, he returned with fists clenched and arms raised, stating, "I told you I was going to get you[,] [R]atzel." (Ratzel Aff. ¶ 26.) Seidl's version of the events that evening is markedly different. He maintains he opened Ratzel's door slightly, looked into Ratzel's room, and discussed Ratzel's noncompliance, keeping his right hand on the door until he backed away. (Seidl Aff. ¶¶ 30-37.) Seidl maintains that at no time did he enter Ratzel's room, and that the only physical contact between them occurred when Ratzel accidentally bumped into his arm when he tried to close Ratzel's door. (*Id.* ¶¶ 48-50.)

**ANALYSIS**

Chapter 980 patients are civil detainees, and so, unlike prisoners, they may not be punished. *Youngberg v. Romeo*, 457 U.S. 307, 320 (1982). However, chapter 980 patients may be subjected to "conditions that advance goals such as preventing escape and assuring the safety of others . . . ." *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003). When determining whether conditions of

3

civil confinement are punitive, courts are to defer to the judgment exercised by qualified professionals. *Youngberg*, 457 U.S. at 321. The term "qualified professionals" means persons who are "competent, whether by education, training or experience, to make the particular decision at issue." *Id.* at 323 n.30. Decisions made by such professionals regarding the conditions of civil confinement are "presumptively valid." *Id.* at 323. In reviewing such decisions, the court's role is to "make certain that professional judgment in fact was exercised. . . . [rather than] to specify which of several professionally acceptable choices should have been made." *Id.* at 321 (citation omitted); *see also Barichello v. McDonald*, 98 F.3d 948, 953 (7th Cir. 1996).

This professional judgment standard applies not only to those with formal training, but also to those in the trenches (i.e., those who must make decisions without delay), provided that they are subject to the supervision of qualified professionals and refrain from making long-term treatment decisions. *Youngberg*, 457 U.S. at 323 n.30. Thus, Psychiatric Care Technicians' day-to-day decisions affecting the conditions of civil confinement are analyzed under the professional judgment standard. *Williams v. Nelson*, 398 F. Supp. 2d 977, 988-89 (W.D. Wis. 2005); *Robinson v. Fergot*, No. 04-C-193-C, 2005 WL 300376, *5 (W.D. Wis. 2005). According to the Seventh Circuit, professional judgment "generally falls somewhere between simple negligence and intentional misconduct." *Estate of Porter v. Illinois*, 36 F.3d 684, 688 (7th Cir. 1994) (quoting *Shaw by Strain v. Strackhouse*, 920 F.2d 1135 (3rd Cir. 1990)).

In discussing the Due Process protections of pretrial detainees—a group that, like civil detainees, may not be subjected to punitive conditions of confinement—the Supreme Court has also noted that "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense . . . . Once the Government has exercised its conceded authority to detain a

4

person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). In determining whether a condition or restriction is punitive, the key question is therefore "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538. Clearly, the State has a legitimate interest in maintaining order and security at institutions housing civil detainees. *See Robinson* at *5. Thus, there are occasions in which the State must necessarily restrain detainees' movements as an incident of maintaining order and security. *See Youngberg*, 457 U.S. at 320; *Allison*, 332 F.3d at 1079. The more general standard for assessing whether the conditions to which a civil committee is subjected or the restrictions imposed upon him violate due process is whether they are rationally related to a legitimate purpose such as maintaining institutional order and security. *West v. Macht*, 235 F. Supp.2d 966, 974-75 (E.D. Wis. 2002).

Finally, a claim of excessive force can not ordinarily be predicated on a *de minimis* use of physical force. *Floyd v. Nelson*, 2002 WL 1483896, *7 (N.D. Ill. July 11,2002) (*citing DeWalt v. Carter*, 224 F.3d 607, 620 (7th Cir. 2000)). Not every malevolent touch by a prison guard gives rise to a federal cause of action. *Hudson v. McMillan*, 503 U.S. 1, 9 (1992). *See Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). In order for conduct by a government official to give rise to a cognizable substantive due process claim, it must be such as to shock the conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

Regardless of which standard is used here, Ratzel's claim fails. In order to overcome the presumptive validity of Seidl's decisions, Ratzel must present some evidence that Seidl's decisions

5

fell outside the bounds of professional judgment and crossed over into the punitive. *See Robinson* at *5. In light of Ratzel's admissions, the self-contradictory nature of Ratzel's evidence, and defendant's videotape evidence,[2] I find insufficient evidence exists that would allow a reasonable juror to conclude that Seidl's conduct fell outside the bounds of professional judgment or otherwise constitutes punishment. Ratzel makes several telling admissions: (1) he was non-compliant with the medication pass procedures known to him; (2) he continued to engage in behavior that Seidl viewed as suspicious and potentially dangerous; (3) Seidl was justified in approaching him to assess the situation and ensure compliance with the medication pass procedures; and (4) Seidl's only motive at that time was to ensure that all patients received their prescribed medication in an efficient and confidential manner. (Pl.'s Statement of Disputed Facts at 15-16.) In light of these admissions alone, it is difficult to see how a reasonable juror could construe Seidl's conduct as punitive and outside the bounds of professional judgment.

Ratzel's submitted evidence does nothing to change the picture. With respect to the critical facts at issue in this case, Ratzel's evidence is internally inconsistent, fails to refute defendant's proposed findings, and/or is contradicted by defendant's undisputed videotape evidence of the events. For example, according to the affidavit of James Bell, Seidl pushed Ratzel "hard into the wall" and then pushed Ratzel again, whereupon Ratzel pushed Seidl's hand away; Seidl then "put his fingers into" Ratzel's chest, and Ratzel again pushed Seidl's hand away. (Bell Aff. at 2.) According to Peter Yogerst, Seidl twice *tried* to push Ratzel inside his room (but no mention is made as to whether Seidl succeeded); on Seidl's third attempt to push Ratzel into his cell, Ratzel

---

[2] A videotape extracted from the camera located in Unit H 18 shows the events occurring immediately before, during, and after this medication pass on October 16, 2005.

slapped Seidl's hand away. (Yogerst Aff. at 2; emphasis added.) Ratzel's own affidavit does not support either of these patients' accounts. Rather, Ratzel avers he was pushed only once by Seidl, which caused him to stumble backward about six feet and lose his breath for six seconds. (Ratzel Aff., ¶¶ 16, 20-22.) Finally, Shermell Tabor did not see any altercation but only heard Ratzel yell loudly at Seidl not to touch him and to keep his hands off him. (Tabor Aff. at 2.) Tabor's affidavit does not dispute defendant's proposed findings as to what occurred during the few critical seconds, for Seidl admits there was physical contact—albeit casual and incidental—between himself and Ratzel. (Seidl Aff. ¶¶ 47, 48.) To take another example of the dubious nature of Ratzel's evidence, Ratzel claims that Seidl, while returning to the staff desk, turned and began to walk back toward Ratzel with his fist clenched and arms raised. (Ratzel Aff., ¶¶ 24, 26.) However, this is clearly refuted by the videotape of the incident; the tape shows Seidel simply turned his head to look back at Ratzel and made a quick, low, sweeping arm motion without breaking stride en route to the staff desk. (Video at frames 2840-75.[3])

Defendant's videotape evidence is indisputable proof of the events that transpired in Unit H 18 before, during, and after the incident at issue, given that Ratzel has not challenged the videotape's authenticity. (Pl.'s Statement of Disputed Factual Issues at 6; *see* DPFOF ¶ 21.) The entirety of Seidl's body is fully visible on the videotape during the incident in question, save for a few seconds when he is standing outside Ratzel's door.[4] During those seconds, it is only Seidl's left

---

[3] The relevant frame numbers on the videotape copy submitted as evidence range from 2600 to 2900, although defendant cites frames from roughly 380 to 600. However, this difference in frame numbering does not change the court's analysis.

[4] There is no time log recorded onto the videotape. Nevertheless, the total amount of time Seidl would have had to assault and/or batter Ratzel is the equivalent of the amount of time it took a patient on the other side of the room to take three steps. Outside that "three-step" time interval, Seidl's full body remained in view of the camera. (Videotape at frames 2676-82.)

7

arm that is not visible. (Videotape at frames 2676-82.) However, no reasonable viewing of the videotape could support Ratzel's allegations. Seidl's right hand remains on Ratzel's door during these seconds, and the viewable portion of Seidl's body (that is, all but his left arm) remains calm, showing no indication that he violently shoved Ratzel once, much less several times. Moreover, except for a few frames immediately after Seidl arrived at Ratzel's door (Videotape at frames 2676-83), Ratzel's head can be seen through the glass in his opened door, which indicates he had not suffered a violent push as alleged. Indeed, the videotape shows that Seidl exercised considerable restraint and removed himself from the situation rather quickly, which is consistent with his statement that he walked back to the staff desk so as to avoid inciting any further commotion among the patients.[5] (DPFOF ¶ 51.)

Viewing all the evidence in the light most favorable to Ratzel, no reasonable juror could find his story credible. The videotape clearly shows the absence of any use of unreasonable force by Seidl to get Ratzel to comply with important and legitimate institutional rules. Furthermore, Ratzel's own admissions and evidence show that Ratzel defied repeated direct orders to close his door, physically slapped Seidl, continued to threaten and verbally assault Seidl after the incident, and instigated a potentially dangerous situation involving other patients. (Pl.'s Statement of Disputed Factual Issues at 15; Yogerst Aff. at 2; *see* DPFOF ¶ 56.)

---

[5] The evidentiary material Ratzel cites in order to refute this proposed finding does not actually refute it. Ratzel has put forward no evidence to refute that Seidl, aware of the low number of staff present and seeing that other patients were beginning to open their doors and cause commotion, walked back to the staff desk so as to avoid inciting more agitation among the patients.

8

## CONCLUSION

Ratzel has failed to show a genuine issue of material fact as to whether Seidl's conduct during the evening medication pass was anything other than incidental to furthering the government's legitimate interest in maintaining security and order. Thus, he has failed to put forth evidence that might overcome the presumption that Seidl's actions fell within the bounds of professional judgment. Accordingly, no reasonable juror could conclude that Seidl's actions were punitive.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment be granted**.** All of plaintiff's claims are dismissed, with prejudice.

Dated this   3rd   day of November, 2006.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
